UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Brandon Velez,
     Plaintiff

     v.                                    Case No. 23-cv-44-SM-TSM
                                           Opinion No. 2024 DNH 048

Rachael Eutzy, Erik Slocum,
Casey Seigle, and
The City of Manchester, N.H.,
     Defendants

# O R D E R

In February of 2021, at around 1:20 a.m., Brandon Velez was driving his car near his apartment in Manchester, New Hampshire. Officers Eutzy and Slocum of the Manchester Police Department were on patrol and driving a marked police cruiser. As Velez's vehicle approached them, the officers noticed that one of the headlights on his car was broken and they initiated a routine traffic stop. After a brief interaction with Velez, Officer Eutzy instructed him to get out of the car. He refused and then resisted her efforts to drag him out of the car. A brief struggle ensued as Eutzy and Slocum forcibly removed Velez from the car. He was arrested, taken into custody, and charged with disobeying a police officer and resisting arrest (both misdemeanors) and operating at night without a headlight (a

violation).  Velez pled guilty to the traffic violation and the
misdemeanor charges were dropped.

    Velez then brought this civil suit in which he alleges,
among other things, that he was the victim of excessive force,
battery, wrongful arrest, and false imprisonment.  In total, he
advances eleven federal and state common law claims against the
City of Manchester and three of its police officers.  Defendants
move for summary judgment on all claims in Velez's complaint,
asserting that there are no genuinely disputed material facts
and claiming they are entitled to judgment as a matter of law.
Velez objects.  For the reasons discussed, defendants' motion is
granted.

## Standard of Review

    When ruling on a motion for summary judgment, the court is
"obliged to review the record in the light most favorable to the
nonmoving party, and to draw all reasonable inferences in the
nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers,
844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary
judgment is appropriate when the record reveals "no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this
context, a factual dispute "is 'genuine' if the evidence of

record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted). When material facts are genuinely disputed, such a dispute must be resolved by a trier of fact, not by the court on summary judgment. See, e.g., Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002).

When objecting to a motion for summary judgment, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enterprises, 769 F.3d 23, 29–30 (1st Cir. 2014). In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 451–52 (1st Cir. 2014). See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

In this case, the parties offer vastly different
interpretations of the relevant facts.  Consequently, it is
probably important to note that,

> When the moving party has carried its burden under
> Rule 56(c), its opponent must do more than simply show
> that there is some metaphysical doubt as to the
> material facts.  Where the record taken as a whole
> could not lead a rational trier of fact to find for
> the nonmoving party, there is no "genuine issue for
> trial."  The mere existence of some alleged factual
> dispute between the parties will not defeat an
> otherwise properly supported motion for summary
> judgment; the requirement is that there be no genuine
> issue of material fact.
>
> When opposing parties tell two different stories, one
> of which is blatantly contradicted by the record, so
> that no reasonable jury could believe it, a court
> should not adopt that version of the facts for
> purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167
L. Ed. 2d 686 (2007) (citations and internal punctuation
omitted) (emphasis in original).

## Background

The relevant and material facts in question were all
documented by the body-cameras worn by defendants Sergeant
Seigle, Officer Eutzy, and Officer Slocum.  See Exhibits A-1, B-
1, E-1 to Defendants' Memorandum (document no. 15) (filed
conventionally).  Those videos are supplemented by the affidavit
of the plaintiff, Brandon Velez (document no. 19-7) and his

deposition testimony (document no. 15-4), as well as the affidavits of the defendants, Officer Eutzy (document no. 15-2), Officer Slocum (document no. 15-3), and Sergeant Seigle (document no. 15-5), and excerpts from their depositions (documents no. 19-2, 19-3, and 19-6, respectively).

On February 22, 2021, shortly after 1:00 a.m., Velez drove from his apartment to a nearby Cumberland Farms to purchase snacks and cigarettes.  As he passed the store, he saw that it was closed and headed back toward his apartment.  At the same time, Manchester police officers Eutzy and Slocum were on patrol in a marked police cruiser.  Eutzy was driving and Slocum was in the passenger's seat.  Velez was headed east on Hanover Street and the officers were driving west.  As the vehicles passed each other, Eutzy and Slocum noticed that one of the headlights on Velez's car was out.  At his deposition, Velez testified that he had been aware for at least a few days that the headlight was not functioning.

Eutzy made a U-turn in an effort to catch up with Velez and stop him for the headlight violation.  Once they were behind Velez's car, the officers noticed that one of Velez's taillights was also out.  The officers also testified that Velez's car was making an unusually loud noise.  So, at that point, the officers

had observed at least two (and possibly three) motor vehicle violations.

Both Officers testified that once they began following Velez, they observed a change in his driving behavior. Specifically, both testified that he increased the speed of his vehicle, which suggested to the officers that Velez wanted to avoid an interaction with them and might be engaged in (or about to engage in) criminal activity.  In their depositions, Officer Eutzy repeatedly described Velez's driving as "evasive" and Officer Slocum said he believed Velez was attempting to "elude" them.  Velez saw the officers make a U-turn on Hanover Street, but says he didn't think they were following him (though he does concede that there were no other cars on the road at the time). He denies attempting to evade or elude them.

With the officers following behind him, Velez made a left turn onto Maple Street and an immediate left onto Amherst Street.  At that time, Officer Eutzy activated the cruiser's blue lights to signal Velez to pull over and to initiate the traffic stop.  Velez turned into the driveway of his apartment on Amherst Street and turned off the car's engine.  According to Officer Slocum, the address to which Velez returned was known to him to have been associated with criminal activity, including

6

drug sales and prostitution.  Because of Velez's arguably
suspicious driving, and based upon the location's prior
association with criminal activity, the officers were on alert.
They got out of the cruiser and approached Velez's car - Slocum
on the passenger's side, and Eutzy on the driver's side.
According to Velez, he did not roll down the driver's window
because it was not working.

The officers approached the vehicle at a normal rate of
speed.  Both were carrying flashlights; neither drew a weapon of
any sort.  Eutzy was in uniform, while Slocum was dressed in
plain clothes.  Slocum was first to engage Velez and spoke to
him through the closed passenger's window.  His tone was
friendly, relaxed, and conversational and he said, "Hi.  Police.
Hi.  Talk to my partner over there."  Velez had his hands raised
up and in front of him (something the officers noted was unusual
for someone involved in a minor traffic stop).

Eutzy called in the stop to her dispatcher and approached
the driver's side of the car.  In a relaxed and friendly tone
she said, "Hey, how you doing?," and opened the door so she
could speak with Velez (he was holding his hands in the air and
the window was not open).  He immediately questioned, "Why are
you opening my door?  First off, I live here.  That's

disrespectful.  You're not supposed to open my door just like
that."  Eutzy responded calmly, "Okay, . . . Okay.  How is that
disrespectful?" and Velez began to say again, "you're not
supposed to open my door just like that."  Eutzy then cut him
off and said, in a more stern tone, "Stop talking.  Stop,
alright?"  Velez then said, "Ok, hold on," lowered his hands,
and reached into his left pocket.  Eutzy immediately said, "Hang
on.  Get your hands out of your pockets dude."  As it turned
out, Velez retrieved his cell phone from his pocket.[1]

In response to Velez's movement and out of concern for her
safety, Eutzy decided she wanted him out of the vehicle so she
could search him for weapons.  She calmly said, "Go ahead and
hop out."  Velez responded, "No.  No.  You can't do that."
Eutzy insisted and said, "Come on," and grabbed Velez's left

---

[1]     Velez says he retrieved his cell phone because he planned
to record his interaction with the officers.  His expert witness
goes so far as to suggest that the video from Eutzy's body
camera shows that Velez "appeared to be opening [his phone] by
swiping the screen with his left hand."  Expert Report of
Michael Pearl (document no. 19-5) at 4.  The court disagrees.
At that moment, Velez's left hand and his phone are in the
shadows and obscured by Eutzy's hands and flashlight.  See Eutzy
Body Cam Video at 01:11 - 01:14.  More importantly, perhaps, the
events unfolded so quickly that Eutzy had no time to process
what Velez might have been doing with his phone, nor was there
any indication that he intended to start recording their
interaction.  As soon as he lowered his hands and moved his left
hand into his pocket, Officer Eutzy reacted immediately and
ordered him out of the car.

arm.  Velez began screaming, "Why are you doing this?  Why are you doing this?  You haven't even told me why you pulled me over."  According to Eutzy, Velez never gave her an opportunity to explain the reason for the stop.  He was speaking "very rapidly" and his behavior was aggressive and argumentative.  Eutzy Deposition (document no. 19-2) at 26-27.  See also Id. at 32 ("There are numerous things that he could have done differently.  The one I find to be the most important would have been him giving me the opportunity to identify myself and to give the reason for the stop before he continued to speak.").

Parenthetically, the court notes that although Velez seems to question Eutzy's authority to order him out of the vehicle, there can be no real doubt that, under the circumstances presented (lawful traffic stop, odd behavior by Velez, legitimate safety concerns, etc.), Eutzy was authorized to insist that Velez exit his car.  See, e.g., United States v. Coplin, 463 F.3d 96, 102 (1st Cir. 2006) ("[A] police officer may, as a matter of course, require the driver of a car lawfully stopped for a suspected traffic violation to step out of his vehicle.  That rule is grounded in legitimate concerns for officer safety - and it is dispositive here.  Since the stop was lawful, it follows inexorably that the officers were authorized, as a security measure, to order the driver out of the car

pending the completion of their investigation into the suspected
traffic violation.") (citations omitted).  <u>See generally</u>
<u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 (1977).

    As Velez continued to question why Eutzy was trying to
remove him from the vehicle, he braced himself against the door
frame and pushed himself deeper into the car.  By that point,
Officer Slocum had arrived from the other side of the vehicle
and assisted Officer Eutzy as she attempted to get Velez out of
the car.  Slocum can be heard saying, "Get out of the car.
You're under arrest."  Meanwhile, Velez continued screaming
incomprehensively and shouting "Help!"

    During the brief struggle, Velez continued to brace himself
against the door frame and struggled against the officers'
efforts to remove him from the car.  The officers say that
because they perceived Velez to have been driving erratically
(if not evasively), he had previously had his hands raised in
the air (atypical behavior for someone involved in a routine
traffic stop), was confrontational, if not aggressive, in his
behaviors, and because they had not yet cleared the car of any
potential weapons, they became increasingly concerned with
getting him out of the vehicle.

10

Because Velez continued to struggle against the officers and refused to exit the vehicle, Slocum delivered two blows to Velez's abdomen - a form of "pain compliance" for which Slocum says he was trained as a police officer.  One purpose of the blows was to force Velez to brace himself, so Slocum could see his hands and prevent him from reaching for any weapons.  Another was to "stun" Velez and prevent him from continuing to anchor himself in the vehicle.  Velez remained non-compliant and continued to struggle.  So, Officer Slocum used "two, controlled hard-hand techniques to the area of Mr. Velez's head - again, in an effort to stun Velez and to achieve 'pain compliance.'"

Velez continued to struggle.  He braced his hands on either side of the door frame and one of his legs against Officer Slocum's thigh.  Because the struggle was escalating and the risk of potentially significant injury to Velez and/or the officers was increasing, Slocum decided to deploy his Taser.  He testified as follows:

> Because the interaction was escalating in physicality, I deployed my Taser X2 using the "drive stun" deployment method into Mr. Velez's side area.  It was February, and very cold that evening, and I did not believe that the Taser deployment was effective because Mr. Velez was wearing thick clothing and he continued to thrash his body towards the area of my Taser.  Mr. Velez also flailed his arms and legs and was actively swatting at my Taser.

I deployed my Taser a second time using the "probe"
deployment method into Mr. Velez's abdomen.  Again, I
do not think that neuromuscular incapacitation was
achieved due to Mr. Velez's clothing and continued
thrashing.  However, at this point another officer had
arrived to the scene and was pushing Mr. Velez from
the inside of the passenger side of the car.  I
believe that the "surprise" of the Taser deployment
and the other officer's pushing is what ultimately
allowed Officer Eutzy and I to transition Mr. Velez
down to the ground for handcuffing.

Affidavit of Officer Erik Slocum (document no. 15-3) at paras.

33-34.  Officer Slocum's account is fully consistent with the

video evidence from the officers' body cameras.


Even after Velez was removed from the vehicle and laying on

the ground, he struggled against the officers' efforts to

handcuff him.  He was repeatedly told to "stop fighting" and to

present his hands for cuffing, but he continued to resist and

scream.  Officer Slocum described those events as follows:

Once Officer Eutzy and I had Mr. Velez on the ground,
I observed him continue to resist arrest and
detention.  I heard Officer Eutzy give multiple
commands to stop fighting and to provide his hands for
handcuffing.  I also advised Mr. Velez to stop
fighting and submit to the handcuffing.  Mr. Velez
continued to resist arrest and detention.  He refused
to turn onto his stomach as directed.

Eventually, I observed that Officer Eutzy was able to
get one of Mr. Velez's hands into handcuffs, but he
continued to resist arrest and detention for
handcuffing of the second hand.  I then observed
Officer Eutzy secure Mr. Velez's second hand into
handcuffs.

> I heard Officer Eutzy announce that Plaintiff's hands
> were handcuffed.  I went hands-off upon hearing this
> announcement.

Slocum Affidavit at paras. 35-37.  Once he was cuffed and back
on his feet, Velez caught his breath while Eutzy checked that
the handcuffs were properly secured and then locked them.

Meanwhile, Sergeant Seigle arrived at the scene immediately
before the officers successfully had Velez in custody.  Video
from his body camera shows that as he came upon the scene, he
could see that the officers were on the ground, struggling to
handcuff Velez.  Seigle stood to the side and observed; he was
not involved in the effort to handcuff Velez until the very end,
when he reached out and grabbed Velez's sweatshirt/right arm for
approximately three seconds (seemingly to hold Velez still while
officers handcuffed him).  In all, Sergeant Seigle was present
for and witnessed approximately 35 seconds of the struggle
before Officer Eutzy can be heard saying, "got him cuffed."  In
total, from the time at which Officer Eutzy told Velez to "go
ahead and hop out" of the car until the time at which she
notified all responding officers that Velez had successfully
been handcuffed, approximately 2 minutes and six seconds
elapsed.

Velez's recollection of those events is decidedly
different.  He paints a picture in which he was fearful, if not
timid, rather than argumentative and aggressive.  In his view,
he was entirely compliant with every instruction given to him,
and never resisted the officers' efforts to get him out of the
car or to handcuff him.  Rather, he says what the officers may
have perceived to be "resistance" was merely his "instinctive"
and "reflexive" "recoiling" when Officer Eutzy grabbed his arm.
The officers, in his recounting of the relevant events, grossly
overreacted, lacked a legal justification and a factual basis to
remove him from the car, and responded with excessive force in
trying to achieve their illegitimate goal.  While that certainly
may be Velez's perception of what happened to him, it is
contradicted by the video evidence.

As a result of his struggle with the officers, Velez
suffered a small cut on his left hand (perhaps from the effort
to handcuff him) and some minor scrapes and bruising - his
booking photos show a bruise on his forehead and a small
abrasion under his left eye - but no lasting physical injuries.
The police intake form (which Velez signed at the station)
reported that his "general health" was "good."  Nevertheless,
Velez says that despite telling the officers that he was
injured, not a single officer summoned any medical assistance

for him that night/morning.  He says he suffers from ongoing
emotional symptoms arguably consistent with depression as well
as a lasting fear of the police.  There are, however, no medical
records to support those claims.

At the Manchester police station, Velez was processed and
charged with two misdemeanors (disobeying a police officer and
resisting arrest) and a traffic violation (operating at night
without a headlight).  As noted earlier, he pled guilty to the
traffic violation and the misdemeanor charges were dropped.
This litigation ensued.

## Discussion

The Court of Appeals for the First Circuit has provided a
concise summary of the law applicable to nearly all of Velez's
federal claims.

> A person may recover damages from a state or local
> official who, while acting under color of state law,
> commits a constitutional tort.  The excessive use of
> force by a police officer against an arrestee is such
> a tort.  An officer may be held liable not only for
> his personal use of excessive force, but also for his
> failure to intervene in appropriate circumstances to
> protect an arrestee from the excessive use of force by
> his fellow officers.
>
> Liability will attach to the municipal employer where
> its failure to properly train its officers amounts to
> deliberate indifference to the rights of persons with
> whom the police come into contact, and where a

specific deficiency in training is the "moving force"
behind a constitutional injury.  A supervisory officer
may be held liable for the behavior of his subordinate
officers where his action or inaction is affirmatively
linked to that behavior in the sense that it could be
characterized as supervisory encouragement,
condonation or acquiescence, or gross negligence
amounting to deliberate indifference.  If, however,
the officer has inflicted no constitutional harm,
neither the municipality nor the supervisor can be
held liable.

Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002)

(citations and internal punctuation omitted).  Most of Velez's

claims rise or fall on the resolution of a single question: was

the level of force employed by Eutzy and/or Slocum "objectively

reasonable," or was it constitutionally "excessive."

Accordingly, the court turns to those claims first.


I.    Excessive Force (Fourth Amendment).

      Velez asserts that Officers Eutzy and Slocum used excessive

force by "grabbing, punching, and pulling" him from the vehicle

(count 2) and he says Slocum used additional excessive force

when he deployed his Taser (count 3).  According to Velez,

      Upon asking why he was being detained and
      instinctively slightly shrinking away, Eutzy and
      Slocum responded by repeatedly punching Brandon in the
      face and head, pulling him from his vehicle, and
      throwing him onto the ground.  Brandon had not
      committed, nor was he about to commit, a crime.  Nor
      was there probable cause to believe that he did or
      was.  Even if he had committed a crime, or if there
      was probable cause to believe so, the force used far

exceeded what was necessary to effectuate Brandon's arrest.

Brandon had done nothing to merit the use of such force, and the use of such force was objectively unreasonable.

                              * * *

Slocum initially tased Brandon less than ten seconds after Eutzy told Brandon to get out of the vehicle, and despite not having resisted.  Immediately after that, as he was thrown to the ground and pinned, Brandon had given himself up, and he was not resisting in any way, yet Slocum tased him again.

Brandon was still not engaged in any behavior that made it necessary for the use of such force.  Thus, the force was objectively unreasonable, and therefore excessive.

Complaint (document no. 1-1) at paras. 42-43, 47-48 (emphasis supplied).  As the video evidence plainly shows, however, Velez's account of the relevant events of that evening - especially as it relates to his own behavior - is not accurate. A brief, but more correct, summary of the indisputable evidence is this: Velez refused to comply with Officer Eutzy's lawful command to exit his vehicle and then actively and relentlessly resisted the officers' efforts to remove him and, subsequently, to secure him in handcuffs.

In Graham v. Connor the Supreme Court discussed the basic contours and elements of an excessive force claim:

> The "reasonableness" of a particular use of force must
> be judged from the perspective of a reasonable officer
> on the scene, rather than with the 20/20 vision of
> hindsight.  The Fourth Amendment is not violated by an
> arrest based on probable cause, even though the wrong
> person is arrested, nor by the mistaken execution of a
> valid search warrant on the wrong premises.
>
> With respect to a claim of excessive force, the same
> standard of reasonableness at the moment applies: Not
> every push or shove, even if it may later seem
> unnecessary in the peace of a judge's chambers,
> violates the Fourth Amendment.  The calculus of
> reasonableness must embody allowance for the fact that
> police officers are often forced to make split-second
> judgments - in circumstances that are tense,
> uncertain, and rapidly evolving - about the amount of
> force that is necessary in a particular situation.

Graham v. Connor, 490 U.S. 386, 396-97 (1989) (emphasis

supplied) (citations and internal punctuation omitted).  The

inquiry into whether the officers' conduct was "reasonable" is

an objective one.  That is to say, "The question is whether the

officers' actions are 'objectively reasonable' in light of the

facts and circumstances confronting them, without regard to

their underlying intent or motivation."  Id. at 397.


    More recently, the Court set out a non-exhaustive list of

factors that are relevant when considering whether an officer's

use of force was "objectively reasonable" or "excessive."  Those

factors include the following:

> the relationship between the need for the use of force
> and the amount of force used;

any effort made by the officer to temper or to limit the amount of force;

the severity of the security problem at issue;

the threat reasonably perceived by the officer;

whether the plaintiff was actively resisting; and

the extent of the plaintiff's injury.

See Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015).


Here, each of those factors counsels in favor of the conclusion that neither Officer Eutzy nor Officer Slocum employed constitutionally excessive force against Velez.  From the perspective of an objective observer, Velez's behavior that night was suspicious.  He appeared to be driving erratically and/or evasively as soon as the officers began to follow him. He stopped his car in front of an apartment complex known (at least to Slocum) to have a history of criminal activity.  Upon stopping his vehicle, Velez immediately raised his hands and held them above his head - something the officers noted was atypical behavior for a motorist involved in a routine traffic stop.  Almost immediately after Officer Eutzy began talking with him, Velez became excited, confrontational, and aggressive in his tone and manner of speech.  Then, when he suddenly reached into his pocket (to retrieve what turned out to be his phone) at

the same time that Eutzy told him not to move his hands, she
reasonably decided that he needed to exit the vehicle so she
could pat him down for weapons.  She gave him a lawful order to
do so, but he refused to comply, saying, "No.  No.  You can't
do that."  She then grabbed his sweatshirt and attempted to pull
him out of the car.  Velez actively resisted her efforts, braced
himself against the door frame, and began struggling and
screaming.  All of the events about which Velez complains could
have been avoided had he remained calm, allowed Eutzy the
opportunity to introduce herself and explain the reason for the
stop, and complied with her lawful (and reasonable) commands.
He did not.  Instead, he continued to interrupt her, he abruptly
lowered his hands and reached into his pocket (giving her good
reason for concern), refused to exit the vehicle when told to do
so, and then fought the officers' efforts to extract him.[2]

---

[2]     As plaintiff's expert witness notes, with the benefit of
hindsight and without the stresses and potential dangers that
were present that night, it is possible to imagine things the
officers might have done differently.  For example, plaintiff's
expert suggests that Eutzy could have identified herself and
stated the reason for the stop through Velez's closed (and
apparently non-functioning) driver's window, before she opened
the car door.  Perhaps that is true.  But, that she did not does
not affect the analysis of whether she or Slocum employed
excessive force once Velez was told to exit the vehicle and then
steadfastly refused.

Officer Eutzy's decision to instruct Velez to exit the car
was both lawful and reasonable.  The level of force used by the
officers to extract him from the vehicle (and to prevent him
from possibly accessing anything that could be used as a weapon)
was reasonable and escalated in measured form.  Eutzy began by
telling him to exit in a calm tone.  He refused.  She then
tugged on his sweatshirt.  He recoiled, braced himself against
the door frame, and began screaming.  Slocum arrived and
attempted to pull Velez from the car.  When Velez escalated his
resistance, Slocum struck him - twice in the abdomen (with no
result) and then twice in the head (again, with no result).
Velez continued to struggle, resist, and scream.

The impasse continued, with no apparent resolution in sight
and the possibility that someone might be seriously injured
increased by the moment.  Officer Slocum decided to employ less-
than-lethal force - in the form of a Taser - to secure Velez's
compliance and to extract him from the vehicle.  Given the
circumstances facing him, Slocum's decision was both objectively
reasonable and measured.  Once Velez was removed from the car
and taken to the ground, he continued to resist, but the
officers' response remained tempered and appropriate as they
struggled to gain control of Velez's hands and secure them in
handcuffs (for example, Velez does not claim - and there is no

evidence to suggest - that any of the officers punched, kneed, or kicked him; they simply restrained him and struggled to control his arms and hands). Although the events in question unfolded rapidly and under conditions that would reasonably give any officer concern for their safety, defendants escalated the level of force employed against Velez in a measured way and only in response to his increasing resistance.

And, finally, although a far less significant factor, it bears noting that Velez's physical injuries were comparatively minor: a bump on his forehead, a scrape under his eye, and a small cut on his hand (and, perhaps, some bruises and/or scrapes on his lower body that were not visible in his booking photos). None of those injuries was lasting or serious. See generally Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208-09 (1st Cir. 1990).

Viewing the totality of circumstances facing Officers Eutzy and Slocum that night, a reasonable and properly-instructed jury could not, as a matter of law, conclude that either officer acted in a manner that was objectively unreasonable or excessive. Consequently, as to plaintiff's excessive force claims, defendants are entitled to judgment as a matter of law.

II.  <u>Failure to Intervene</u>.

In count six of his complaint Velez alleges that Sergeant Seigle violated his constitutionally protected rights by failing to stop Eutzy and/or Slocum from using excessive force.  It is well established that a police officer can, under certain circumstances, be liable for his or her failure to intervene to stop another officer's use of excessive force.  <u>See, e.g.,</u> <u>Simone v. Monaco</u>, No. 20-CV-336-SM, 2020 WL 5077178, at *3-4 (D.N.H. Aug. 27, 2020).  But, Sergeant Seigle arrived at the scene only in time to observe the last few seconds before Velez was secured in handcuffs.  It is, therefore, unclear how, if at all, he could have intervened on Velez's behalf.  <u>See, e.g.,</u> <u>Gaudreault</u>, 923 F.2d at 207, n.3 ("A police officer cannot be held liable for failing to intercede if he has no 'realistic opportunity' to prevent an attack.").

More importantly, however, because the court has already concluded that the force used against Velez was, as a matter of law, objectively reasonable and not excessive, there cannot be any derivative claim against Sergeant Seigle based upon his alleged failure to intervene.  <u>See generally</u> <u>Simone v. Monaco</u>, No. 20-CV-336-SM, 2022 WL 88196, at *9-10 (D.N.H. Jan. 6, 2022) (noting that one essential element of the "failure to intervene claim" is, of course, that the bystander officer must have

actually witnessed the use of excessive force and appreciated it
as such); <u>Norton v. Cross Border Initiative Task Force</u>, No. 06-
CV-490-PB, 2009 WL 1651238, at *6 (D.N.H. June 12, 2009) (same).

III. <u>Retaliatory Arrest (First Amendment)</u>.

In count one of his complaint, Velez asserts that Officer
Eutzy arrested him "in retaliation for exercising a
constitutionally protected activity, for which there was no
probable cause."  Complaint at para. 37.  Specifically, Velez
claims Eutzy "arrested [him] <u>because he was attempting to record</u>
her [on his cell phone]."  <u>Id</u>. at para. 38 (emphasis supplied).
But, aside from the temporal proximity between Velez reaching
into his pocket and Eutzy's immediate decision to remove him
from the car, there is no evidence to support such a claim
(other than Velez's testimony that, <u>if he had been permitted the</u>
<u>time to unlock his phone and open his camera</u>, he would have
begun recording).  From Eutzy's perspective (or that of any
objective observer), there was no suggestion that Velez intended
to record their interaction nor, more importantly, is there any
evidence that Eutzy <u>understood</u> that was Velez's plan.  <u>See</u> Eutzy
Deposition at 64.

If Velez had told Eutzy, "hey, I want to record this
interaction," or if he had already been recording when she

24

opened the car door to speak with him, perhaps he might have a
more substantial claim.  But, on this record, there is no
evidence from which a jury might plausibly and sustainably
conclude that Eutzy arrested Velez <u>in response to</u> and <u>in
retaliation for</u> Velez's unexpressed and undisclosed plan/desire
to record their interaction.


IV.  <u>Wrongful Arrest (Fourth Amendment)</u>.

   Next, Velez contends that Officer Eutzy, Officer Slocum,
and Sergeant Seigle violated his constitutionally protected
right to be free from arrest that is unsupported by probable
cause.  Probable cause exists when,

> police officers, relying on reasonably trustworthy
> facts and circumstances, have information upon which a
> reasonably prudent person would believe the suspect
> committed or was committing a crime.  It does not
> require law enforcement officers to have an ironclad
> case on the proverbial silver platter.  Instead, it
> suffices if a prudent law enforcement officer would
> reasonably conclude that the <u>likelihood existed that
> criminal activities were afoot</u>, and that a particular
> suspect was probably engaged in them.  Consequently,
> probable cause is not a creature of certainty and does
> not require either the level of proof needed to secure
> a conviction or even an unusually high degree of
> assurance.

<u>United States v. Centeno-Gonzalez</u>, 989 F.3d 36, 45 (1st Cir.
2021) (emphasis supplied).  <u>See also</u> <u>Bryant v. Noether</u>, 163 F.
Supp. 2d 98, 107-08 (D.N.H. 2001).

On the record evidence before the court it is plain that
defendants had probable cause to arrest Velez and his claim to
the contrary lacks both legal and factual support.  Initially,
the officers had an obvious and undeniable reason to suspect
that Velez had committed a traffic offense: he was driving at
night with a non-operational headlight.  Velez concedes that.
There is, then, no dispute that the traffic stop itself was
entirely lawful.

But, both officers testified that even before Velez stopped
his vehicle and while they were following him, Velez sped up and
his driving became "evasive."  See, e.g., Deposition of Rachael
Eutzy (document no. 19-2) at 21, 22, and 31; Deposition of Erik
Slocum (document no. 19-3) at 22.  Additionally, Officer Slocum
testified that he asked Velez his name and address at least
twice and both times Velez refused to provide that information.
Id. at 37.  See also Slocum Body Cam Video at 04:45-04:52.  See
generally RSA 265:4 (it is unlawful to "willfully attempt to
elude pursuit by a law enforcement officer by increasing speed"
and it is also unlawful for any driver to refuse to provide
their name, address, and date of birth when requested by a law
enforcement officer).

While Velez denies that he attempted to evade the officers
(or increased his speed) and says he was never asked to provide
his name and address until _after_ he was in handcuffs, it is
indisputable that he refused to comply with Officer Eutzy's
lawful and objectively reasonable command to exit his vehicle.
It is equally plain that he then resisted both the effort to
extract him from the vehicle and to secure him in handcuffs.
See generally RSA 642:2 (it is unlawful for anyone to "knowingly
or purposely physically interfere with a person recognized to be
a law enforcement official, including a probation or parole
officer, seeking to effect an arrest or detention of the person
or another _regardless of whether there is a legal basis for the_
_arrest_.") (emphasis supplied).

Despite the video evidence to the contrary, Velez
repeatedly claims that he did not disobey any orders from the
officers, see, e.g., Plaintiff's Opposition Memorandum at 31,
33, and he says "there is no extrinsic evidence supporting a
claim that [he] was in any way resisting," see id. at 21.  See
also Id. at 33 ("Neither Eutzy nor Slocum had probable cause to
arrest [Velez].  He had committed no crime and was not
disobeying any orders.  Instead, Eutzy and Slocum arrested
[Velez] for asking questions and attempting to record them.").
Velez inexplicably ignores Eutzy's recorded order to get out of

the vehicle, to which he responded, "No.  No.  You can't do that" - thereby demonstrating that he plainly heard and understood her command.  He also ignores his recorded active resistance to the officers' efforts to extract him from the vehicle.  In Velez's view, his conduct was not that of opposition or confrontation.  Rather, he characterizes it as simply a "reflexive reaction" to having been "grabbed without warning, repeatedly punched, and tasered," id. at 7, and describes himself as "non-threatening and frightened," id. at 33.

Of course, it may explain Velez's conduct to characterize it as "fearful," or "instinctive," or "reflexive," but that does not excuse it.  Nor does it convert that behavior into something other than what it plainly was.  Velez was given a lawful order to exit the vehicle and, for whatever reason, he decided to refuse and he then actively and forcefully resisted.  Those facts are established and not open to reasonable debate.

Velez's arrest was entirely consistent with the requirements of the Fourth Amendment and amply supported by probable cause.  As to Velez's claim that he was wrongfully arrested, in violation of the Fourth Amendment, defendants are entitled to judgment as a matter of law.

V.   <u>Failure to Render Medical Assistance</u>.

   Next, Velez claims that all individually named defendants
violated his substantive due process rights when they failed to
provide him with prompt medical assistance for his obvious and
severe injuries.  Complaint at paras. 56-57.  Velez correctly
articulates the applicable legal standard - including the
requirement that the plaintiff must have had a "serious medical
need" that was so obvious that even someone not trained in
medicine would recognize it.  <u>See</u> Plaintiff's Opposition
Memorandum at 28.  <u>See generally</u> <u>Miranda-Rivera v. Toledo-</u>
<u>Davila</u>, 813 F.3d 64, 74 (1st Cir. 2016) ("A 'serious medical
need' is one that has been diagnosed by a physician as mandating
treatment, or one that is so obvious that even a lay person
would easily recognize the necessity for a doctor's attention.")
(citation omitted).


   Importantly, however, Velez has failed to identify or
document any such injuries or "serious medical needs."  Instead,
he focuses on the fact the he was screaming "I can't breathe"
throughout his resistance to the officers' efforts to subdue
him, claimed he was "hurt" in the aftermath of that struggle,
and cried "ow" as he was being escorted to a police cruiser -
all implying (it would seem) that any reasonable, objective
observer would have (and should have) recognized he had a

"serious medical need" requiring prompt professional attention. See, e.g., Plaintiff's Opposition Memorandum at 29-30.  But, even following his release from custody, Velez waited nearly two days before seeking medical advice about his soreness and pain. Deposition of Brandon Velez (document no. 15-4) at 47-48.

In his deposition, Officer Slocum was questioned at length about the steps he took to verify that Velez did not require professional medical attention:

> Q.   If a member of the public receives several strikes to the head, will you look into whether they need medical attention?
>
> A.   If they're alert and oriented and say they do not need medical attention or make no indication that they need medical attention, I would not; however, if they were -- say, had altered mental status, unable to answer questions appropriately, yeah, I would be concerned and call for, say, medical assistance.
>
> Q.   What if a person indicates they're having trouble breathing; is that an indication that you need to see if they need medical attention?
>
> A.   Depends on the circumstance.
>
> Q.   Can you expound on that?
>
> A.   Yes.  If they, say, have just been in a physical altercation and appear to be showing signs of just being -- exerting themselves physically, say, a physical fight or something of that nature, if they say that they are having trouble breathing, if that took -- if it never resolved itself within a short time -- space, absolutely, that would be something to worry about.

Q.   What steps did you take to ensure that if Brandon
     Velez needed medical attention, he would receive
     it?

A.   Brandon Velez never requested any medical
     attention that night.  It is posted in our
     booking area, that if you do need medical
     attention, just ask for it.  He made no
     indication that he needed medical attention.

Q.   What steps did you take to determine whether or
     not Brandon needed medical attention?

A.   As far as my observations?

Q.   No, what steps did you take to determine whether
     or not Brandon needed medical attention?

A.   Through my observations of his actions, his
     mental status, his ability to breathe, speak and
     function, stand on his own.  Through my
     observations.

Q.   So did you observe Brandon being punched in the
     head?

A.   Yes.

Q.   Multiple times?

A.   Yes.

Q.   Did you observe Brandon saying that he was having
     trouble breathing?

A.   Momentarily after our physical struggle of him
     resisting arrest, he did say a couple times, I
     cannot breathe.  But he was still able to yell
     and scream and his airway was still patent, he's
     still alert and oriented.  That complaint
     subsided within a matter of seconds.  [After]
     which Mr. Velez was able to stand on his own, was
     able to speak.  I had no concern that he was
     exhibiting any kind of signs of respiratory
     distress.

Q.   Are you a medical professional?

A.   Yes, sir.  I'm an advanced EMT.

Slocum Deposition at 23-26.


Given the circumstances immediately leading up to the point
at which he was finally secured in handcuffs, Velez was, no
doubt, exhausted and in substantial discomfort as he was
escorted to the police transport van.  He put up a brief, but
significant struggle against the officers and considerable
effort was required to subdue him before anyone was seriously
injured.  Velez testified that his discomfort - facial pain,
chest pain where he was struck, and overall soreness - all
largely resolved within a few weeks of the incident.  See
Deposition of Brandon Velez at 53-56.  The injuries Velez
describes do not give rise to a viable claim for deliberate
indifference to a serious medical need.  See, e.g., Gaudreault,
923 F.2d at 207-08 ("[Plaintiff] displayed multiple bruises, to
the forehead, left and right orbits of his eyes, nasal area,
left ribs, right flank and left shoulder, and was suffering from
a corneal abrasion and an abrasion on the upper back. . . .
While his injuries may have been 'obvious' in the sense that his
bruises and abrasions were visible, the medical record
demonstrates that he did not display any needs so patent as to

make lay persons . . . remiss in failing to arrange for
immediate medical attention.") (emphasis in original).

Not only would no reasonable observer have thought that
Velez required prompt medical attention for a "serious medical
need," but there is no suggestion whatsoever that any of the
defendants was "deliberately indifferent" to his health or well-
being.  See Miranda-Rivera, 813 F.3d at 74 ("Deliberate
indifference requires (1) that the official be aware of facts
from which the inference could be drawn that a substantial risk
of serious harm exists, and (2) that he draw that inference.  A
factfinder can conclude that a government official was aware of
a substantial risk of serious harm based on the fact that the
risk was obvious.  However, there is no deliberate indifference
if an official responds reasonably to the risk.") (citations and
internal punctuation omitted).  See generally Farmer v. Brennan,
511 U.S. 825 (1994); Estelle v. Gamble, 429 U.S. 97 (1976).  See
also Affidavit of Officer Eutzy (document no. 15-2) at para. 38
("I observed Mr. Velez's condition.  Mr. Velez did not have any
obvious or serious medical issue apparent to me at this time.  I
recognize (and did at the time) that I have a duty to render
medical aid to a suspect if necessary and appropriate.  However,
I did not see anything about Mr. Velez's condition at that
moment that led me to believe he needed or required medical

aid."); id. at para. 40 (after escorting Velez to the transport
wagon, Eutzy says she "spoke to Velez in a calm, neutral tone.
[She] observed that Mr. Velez had fully caught his breath at
this point and otherwise appeared fine."); id. at para. 41 (at
the station, "Mr. Velez did not appear to have any serious
medical need at booking that caused me to be concerned for his
health.  Mr. Velez also did not request medical attention from
me during booking and processing.  There is a large poster or
sign in MPD's booking area that explains that medical attention
will be provided if requested.  The notice is in several
languages.").  See also Affidavit of Officer Slocum (document
no. 15-3) at para. 41 ("Mr. Velez did not appear to have any
serious medical need at booking that caused me to be concerned
for his health.  Mr. Velez did not request medical attention
from me during booking and processing.").

As to Velez's deliberate indifference claim, defendants are
entitled to judgment as a matter of law.  See generally
Gaudreault, 923 F.2d at 208-09.

VI.   Failure to Train ("Monell" Claim).

Velez's final federal claim is against the City of
Manchester.  In it, he alleges that "an unwritten policy or
custom in Manchester allows officers to use force that is not

34

proportional to the circumstances, allows officers to make
wrongful arrests, and otherwise violate individuals'
constitutional rights."  Complaint at para. 64.  <u>See generally</u>
<u>Monell v. New York City Dept. of Social Srvs.</u>, 436 U.S. 658
(1978).

   But, as the court has already held, the defendant police
officers did not employ excessive force against Velez.
Consequently, the City of Manchester cannot be liable under
<u>Monell</u>.  <u>See, e.g.</u>, <u>City of Los Angeles v. Heller</u>, 475 U.S. 796,
799, (1986) ("[N]either <u>Monell</u>, nor any other of our cases
authorizes the award of damages against a municipal corporation
based on the actions of one of its officers when in fact the
jury has concluded that the officer inflicted no constitutional
harm.  If a person has suffered no constitutional injury at the
hands of the individual police officer, the fact that the
departmental regulations might have authorized the use of
constitutionally excessive force is quite beside the point.").

VII. <u>Common Law Assault and Battery</u>.

   In count eight of his complaint, Velez alleges that
Officers Eutzy and Slocum committed common law assault and
battery by "grabbing, punching, and pulling" him from the
vehicle.  In count nine, he further alleges that Officer Slocum

committed assault and battery upon him when Slocum deployed his

Taser.  Given the evidence of record, those claims fail as a

matter of law.


As this court (Barbadoro, J.) has noted, police officers

are permitted to use that amount of force reasonably necessary

to take a suspect into custody.

> [Plaintiff] alleges that the officers' conduct in
> arresting him constitutes assault and battery.  In New
> Hampshire, justification is a complete defense to any
> civil action, and "[a] law enforcement officer is
> justified in using non-deadly force upon another
> person when and to the extent that he reasonably
> believes it necessary to effect an arrest or
> detention[.]"  N.H. Rev. Stat. Ann. § 627:1; N.H. Rev.
> Stat. Ann. § 627:5.  Under this statute,
> reasonableness is determined by an objective standard.

Dionne v. Amatucci, No. 10-CV-230-PB, 2011 WL 4915550, at *6,

2011 DNH 170 (D.N.H. Oct. 17, 2011) (citing State v. Cunningham,

159 N.H. 103, 107 (2009)).  See also Raiche v. Pietroski, 623

F.3d 30, 40 (1st Cir. 2010) ("Where a plaintiff alleges both a

§ 1983 excessive force claim and common law claims for assault

and battery, our determination of the reasonableness of the

force used under § 1983 controls our determination of the

reasonableness of the force used under the common law assault

and battery claims.").  Moreover, New Hampshire law specifically

provides that, "No person shall incur any civil liability to

another person by taking any action against such person which
would constitute justification pursuant to RSA 627." N.H. Rev.
Stat. Ann. § 507:8-d.[3]


So it is in this case. Officers Eutzy and Slocum were
legally authorized to use reasonable - but not excessive - force
to extract Velez from the vehicle, to secure his hands, to
handcuff him, and to take him into custody. They complied with
that legal mandate. Under the circumstances, and given the
evidentiary record, the conduct of Officers Eutzy and Slocum
was, as a matter of law, objectively reasonable and legally
justified. Consequently, it cannot form the basis of a viable
claim for common law assault or battery.


VIII. <u>False Imprisonment</u>.

Next, Velez alleges that Officers Eutzy and Slocum, as well
as Sergeant Seigle, without probable cause or other lawful
basis, falsely imprisoned and/or wrongfully arrested him. But,
as already noted, the officers <u>did</u> have probable cause to arrest

---

[3]   As noted in <u>Amatucci</u>, <u>supra</u>, the relevant portion of RSA
627:5 provides that, "A law enforcement officer is justified in
using non-deadly force upon another person when and to the
extent that he reasonably believes it necessary to effect an
arrest or detention or to prevent the escape from custody of an
arrested or detained person, unless he knows that the arrest or
detention is illegal."

Velez.  And, as this court has observed, "Probable cause is an

absolute bar to a claim of false arrest asserted under the

Fourth Amendment and section 1983."  Donovan v. Mahoney, No. 22-

CV-215-JL, 2023 WL 3233954, at *4 (D.N.H. Apr. 13, 2023), report

and recommendation adopted, No. 22-CV-215-JL, 2023 WL 3229970

(D.N.H. May 3, 2023)(quoting Dollard v. Whisenand, 946 F.3d 342,

353 (7th Cir. 2019)).  See also Finamore v. Miglionico, 15 F.4th

52, 58 (1st Cir. 2021).


     But, Velez advances his false imprisonment claim under New

Hampshire common law, rather than the Fourth Amendment.  To

prevail, he must demonstrate that:

> (1) the defendant acted with the intent of confining
> him within boundaries fixed by the defendant; (2) the
> defendant's act directly or indirectly resulted in the
> plaintiff's confinement; (3) the plaintiff was
> conscious of or harmed by the confinement; and (4) the
> defendant acted without legal authority.

Ojo v. Lorenzo, 164 N.H. 717, 726 (2013) (citations omitted)

(emphasis supplied).  While the lack of probable cause is not an

element of such a claim, the presence of probable cause "is a

defense to a claim for false imprisonment resulting from a

warrantless detention."  Id. at 727.  Consequently, even though

Velez's claim sounds in state common law, it fares no better

than one brought under the Fourth Amendment: the existence of

probable cause to arrest Velez defeats any common law claim of false imprisonment.


IX.   <u>Common Law Failure to Train</u>.

    Finally, Velez alleges that the City of Manchester is liable to him under New Hampshire's common law for its alleged failure to properly train and supervise it police officers. According to Velez, "Eutzy and Slocum negligently and unlawfully carried out their duties," thereby demonstrating "that there are no guardrails at MPD for scofflaw officers who assault undeserving individuals with impunity."  Plaintiff's Opposition Memorandum at 37, 38.


    New Hampshire common law recognizes a duty on the part of employers to exercise reasonable care in the hiring, retention, supervision, and training of their employees.  <u>See</u> <u>Sheriff v.</u> <u>Four Cousins Burgers & Fries of NH, LLC</u>, No. 21-CV-571-PB, 2023 WL 6976489, at *5 (D.N.H. Oct. 23, 2023).  <u>See also</u> <u>Cutter v.</u> <u>Town of Farmington</u>, 126 N.H. 836, 841 (1985); <u>Marquay v. Eno</u>, 139 N.H. 708, 718–19 (1995).  But, of course, to have a viable claim against an employer (the city), the plaintiff must necessarily have suffered some cognizable wrong or injury at the hands of one of its employees (the police officer).  As discussed earlier, however, none of the defendant police

officers committed any legal wrong against, or caused any unlawful injury to, Velez.

Moreover, as to Velez's common law "failure to train" claim, the City of Manchester is entitled to discretionary function immunity.  "Because decisions about training and supervision of police officers involve a high degree of discretion, the city of [Manchester] is immune from liability under New Hampshire's doctrine of discretionary function immunity."  Jacobson v. City of Nashua, No. CIV. 01-165-B, 2002 WL 1349515, at *6 (D.N.H. June 19, 2002) (citing Hacking v. Town of Belmont, 143 N.H. 546, 549–51 (1999)).  See also Austin v. Town of Brookline, No. 00-284-JD, 2001 WL 1117103, at *7 (D.N.H. Sept. 21, 2001) (a municipality's "decisions regarding training and supervision of employees are discretionary decisions entitled to immunity.").  See generally Maryea v. Velardi, 168 N.H. 633 (2016) (discussing the history and scope of New Hampshire's municipal discretionary function immunity).

## Conclusion

For the forgoing reasons, as well as those set forth in defendants' legal memoranda (documents no. 15-1 and 23), defendants' Motion for Summary Judgment (**document no. 15**) is granted as to all counts advanced in Velez's complaint.  The

Clerk of Court shall enter judgment in accordance with this

order and close the case.

      **SO ORDERED.**

                                            Steven J. McAuliffe
                                            United States District Judge

June 12, 2024

cc:  Counsel of Record